IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CAROLYN SILVA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:12-CV-04697-N-BK |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

This case has been referred to the undersigned for Findings, Conclusions, and Recommendation. Now before the Court are Plaintiff's *Motion for Summary Judgment* (Doc. 15) and Defendant's *Motion for Summary Judgment* (Doc. 16). For the reasons that follow, it is recommended that Plaintiff's *Motion for Summary Judgment* be **GRANTED**, Defendant's *Motion for Summary Judgment* be **DENIED**, the Commissioner's decision be **REVERSED**, and the case be **REMANDED** for further proceedings.

### I. BACKGROUND[1]

**A.     Procedural History**

Plaintiff seeks judicial review of a final decision by the Commissioner denying her claim for Supplemental Security Income (SSI) under the Social Security Act (the Act). In January 2010, Plaintiff filed for SSI, claiming that she had been disabled since January 2008. (Tr. 87, 143-150). Her application was denied at all administrative levels, and she now appeals to this

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

Court pursuant to 42 U.S.C. § 405(g).  (Tr. 1-6, 19-38, 89-93, 99-102).

**B.     Factual Background**

At the time of her alleged onset date of disability, Plaintiff was 50 years old with a high school equivalency diploma and previous work experience as a construction laborer and installer. (Tr. 80, 143, 166).  Plaintiff suffered from numerous physical and mental impairments.  In December 2008, she underwent anterior cervical microdiscectomy at the C4 through C7 levels of her spine, with excision of herniated discs and osteophytes (bony outgrowths), fusion of these levels, and implantation of a fixation plate.[2]  (Tr. 247).  The procedure was performed to address her cervical radiculopathy (disorder of the spinal nerve roots) after conservative treatment had failed.  (Tr. 247-48).  Six weeks after the surgery, she reported feeling 90% better.  (Tr. 454).

X-rays taken in June 2009 showed moderate facet osteoarthritis (degenerative arthritis) at C3-C7, with moderate right uncovertebral (affecting the uncinate process of a vertebra) osteoarthritis at C3-C4.  (Tr. 459).  Plaintiff's surgeon reported that she was doing fairly well and not having any radicular pain.  (Tr. 458).  A CT scan of Plaintiff's cervical spine in August 2009 revealed severe arthrosis (degenerative arthritis) of the right lateral facet joint at C3-C4.  Plaintiff had severe osseous (junction between cartilage and bone) narrowing of the neural foramen (perforation through a bone or membrane) of the right C4 nerve root.  (Tr. 619).

In July 2009, Plaintiff was in a car accident and thereafter complained of neck pain, numbness and tingling of her arms, low back pain, and headaches.  She stated that she had been having residual pain since her surgery at level five on the 0-10 scale, for which she was taking

---

[2] All medical terms are defined by reference to *Stedman's Medical Dictionary* (27th ed 2000), available on Westlaw.

2

Hydrocodone and Valium. On examination six weeks later, her cervical spine was tender, she had decreased range of motion by 95% in extension and 70% in rotation and flexion, tenderness over the thoracic and lumbar spine, decreased pinprick sensation of the right thumb, index finger and forearm, and some decreased sensation over the right forehead and face. (Tr. 427). Plaintiff received emergency treatment for headaches at Huguley Hospital in April, September and October 2009 (Tr. 464, 471, 475), and for injuries sustained in another car accident in November 2009. (Tr. 479).

Consultative examiner Stella Nwankwo, M.D. evaluated Plaintiff in April 2010. (Tr. 494-498). Plaintiff complained of neck pain, headaches, low back pain with radiation down the right leg, and pain in her shoulders, legs, arms, hands, and feet. (Tr. 494). She also reported a recent fall, in which she had injured her right shoulder and arm. (Tr. 495). Dr. Nwankwo noted a bruise and tenderness of the right shoulder and right arm, with a positive Tinel sign (tingling) bilaterally. (Tr. 497). Dr. Nwankwo diagnosed neck pain, back pain, manic depression/panic attacks and acute right shoulder and upper arm sprain. (Tr. 497-498).

Dr. Daniel Theesfeld, a pain specialist, evaluated Plaintiff in February 2010, upon referral from her primary care physician, Dr. Roy Caivano. (Tr. 583-88). Dr. Theesfeld noted that Plaintiff appeared to be in obvious distress and complained of severe pain in her neck and lower back. (Tr. 583-84). Although her gait was slow and antalgic, she could heel and toe walk, but she had a decreased range of motion in her neck and lumbar spine, muscle spasms and trigger points, and an occipital nerve root that was tender and provocative for headache. (Tr. 585). Focal concordant (occurring in pairs) cervical axial pain at multiple levels was also documented during Plaintiff's examination. *Id.* Dr. Theesfeld diagnosed Plaintiff with chronic pain

3

syndrome and severe whiplash due to a car accident. He noted that Plaintiff's condition had failed to improve with extensive conservative care, which had resulted in "psychological factors." (Tr. 586-87). Her manual motor testing and sensory examination appeared normal. (Tr. 585-86). Dr. Theesfeld administered a series of injections, including lumbar blocks and radiofrequency neuroablation. (Tr. 555, 588, 579, 574, 569, 565, 561, 555). He advised that Plaintiff had chronic and severe low back pain that interfered with prolonged sitting or standing and bent over lifting. (Tr. 565). In June 2010, Plaintiff was treated in the emergency room for stabbing right lower neck pain, lower back pain, and bilateral shoulder pain. (Tr. 649).

Sharna L. Wood, Ph.D., conducted a psychological consultative examination on Plaintiff in March 2010. (Tr. 487-492). Plaintiff described significant family conflict in her childhood and reported that her first husband was physically and mentally abusive. After she left him, he killed her boyfriend by shooting him in the face in front of her and her children, which is when her mental problems began. (Tr. 487). Plaintiff reported that she had been raped ten years previously, after which she attempted suicide. She described feelings of worthlessness but no current suicidal ideation. (Tr. 488). Testing found that Plaintiff scored in the severe range of anxiety, depression and hopelessness, and she exhibited a slight tremor of the hands. (Tr. 489). She could recall zero of four words after a five minute delay and could list only two of the last three Presidents. She was able to count backwards from 100 by threes but could only obtain one of six correct answers when doing the same task by sevens. (Tr. 490). Plaintiff told the examiner that she failed to complete tasks, considered herself to be impulsive, and did not handle stress well. (Tr. 491).

Dr. Wood diagnosed Plaintiff with chronic posttraumatic stress disorder (PTSD) and a

mood disorder due to chronic pain, with depressive and anxious features. She gave Plaintiff a global assessment of functioning (GAF) score of 50.[3]  *Id.*  Dr. Wood wrote that Plaintiff was functioning in the "nonimpaired to mildly impaired range on the majority of the domains assessed," appeared cognitively intact, and was functioning at the average intellectual level.  *Id.*  Dr. Wood noted that "given the nature of her psychiatric complaints, it is not reasonable to expect her to return to work in a competitive environment where she will be required to maintain concentration, persistence or pace or work in coordination with others at this time."  (Tr. 492).  Dr. Wood recommended that Plaintiff begin intensive psychotherapy.  *Id.*

Plaintiff was evaluated at Pecan Valley MHMR in January 2011.  (Tr. 655).  She complained of severe functioning problems, severe pain, depression, and memory loss.  (Tr. 665).  She said that she sometimes stayed in bed for three weeks at a time.  *Id.*  The examiner observed pressured speech and noted Plaintiff's apparent anxiety and some flight of ideas.  *Id.*  She reported having been raped at age 19 and again eight or nine years previously.  (Tr. 661).  Plaintiff also reported feeling angry and having outbursts.  *Id.*

In March 2011, Plaintiff complained of a depressed mood every day, with daily mood swings, loss of appetite, and an inability to sleep.  (Tr. 658).  She "appeared groggy with slow, slurred speech" and complained that Lithium made her throw up all the time.  *Id.*  Plaintiff stated that she felt totally dependent upon others and worthless, and she described having memory problems.  *Id.*  In May 2011, Plaintiff was treated in the emergency room after taking an overdose of medication, although she denied suicidal intent.  (Tr. 680-81).

---

[3] A GAF score of 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

### C.     The ALJ's Findings

In the ALJ's August 2011 opinion, he found that Plaintiff had the severe impairments of (1) degenerative disc disease of the cervical spine, status-post discectomy; (2) degenerative disc disease of the lumbar spine; (3) headaches; (4) osteoarthritis of the right third finger; (5) PTSD; and (6) mood disorder due to chronic pain, but those impairments did not meet or equal one of the listed impairments, either separately or in combination.  (Tr. 24-25).  The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform light work with the following limitations:  She could lift and carry 20 pounds occasionally and 10 pounds frequently; she could stand, stand, and walk fox six hours in an eight-hour workday; she required a sit/stand option; she could frequently finger with her right dominant hand; she could occasionally reach overhead, stoop, kneel, crouch, and crawl; she could not climb ladders, ropes, or scaffolds; and she could perform detailed, non-complex job tasks.  (Tr. 26).  The ALJ noted that Plaintiff had only received limited treatment for her mental impairments, was noted to have only mild deficits in memory and concentration during the consultative examination, and self-reported that she could fix small meals and manage money.  Thus, the ALJ found that "she is capable of performing detailed, non-complex tasks."  (Tr. 29-30).  The ALJ found that Plaintiff could not perform her past relevant work.  (Tr. 32).  However, based on the testimony of a vocational expert at the administrative hearing, the ALJ determined that Plaintiff could perform other work available in the national economy.  *Id.*

### D.     Administrative Appeal Proceedings

Subsequent to the ALJ's decision, Plaintiff's counsel obtained a medical source statement from Plaintiff's primary care physician, Dr. Caivano, and submitted it to the Appeals

Council. (Tr. 4, 700-02). Dr. Caivano indicated that Plaintiff could sit for less than three hours and stand and/or walk for less than two hours in an eight-hour workday. He opined that she needed to lie down during the day for "a lot more" than one hour. (Tr. 700). Dr. Caivano noted that Plaintiff could sit for less than 15 minutes at a time and was limited in pushing and/or pulling with her upper or lower extremities due to neck pain and "major" lower back pain. He estimated that Plaintiff could lift and carry less than 10 pounds frequently, and she could occasionally reach and handle. (Tr. 701). Dr. Caivano anticipated that sustained work activity would exacerbate Plaintiff's condition to the point where she would likely be absent from work more than twice per month. The doctor advised that Plaintiff could not sit or stand for more than 15 minutes and that these functional limitations had existed since at least December 2008. (Tr. 702). The Appeals Council acknowledged receipt of Dr. Caivano's statement, but found "that this information does not provide a basis for changing the [ALJ's] decision." (Tr. 1-2).

## II.  APPLICABLE LAW

An individual is disabled under the Act if, *inter alia*, she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or can be expected to last for at least 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner uses the following sequential five-step inquiry to determine whether a claimant is disabled: (1) an individual who is working and engaging in substantial gainful activity is not disabled; (2) an individual who does not have a "severe impairment" is not disabled; (3) an individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors; (4) if an individual is capable of performing her past work, a finding of "not disabled" must be made; (5)

if an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if any other work can be performed. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b-(f)).

Under the first four steps of the analysis, the burden of proof lies with the claimant. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* If the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant can perform. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan*, 38 F.3d at 236; 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett*, 67 F.3d at 564. Under this standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

### III. ARGUMENT AND ANALYSIS

As rephrased and reordered, Plaintiff raises the following issues on appeal: (1) whether the Appeals Council properly evaluated Dr. Caivano's new medical source statement; (2) whether the ALJ accounted for Plaintiff's severe impairments of PTSD and headaches in determining her RFC; (3) whether the ALJ properly evaluated the medical opinion evidence provided by Dr. Wood and Dr. Theesfeld; and (4) whether the ALJ's hypothetical question to the VE incorporated Plaintiff's severe impairments of PTSD and headaches as well as her need for a sit/stand option. (Doc. 15 at 12-19).

As to Plaintiff's first issue, she argues that Dr. Caivano's new medical source statement is material, and the Appeals Council erred by neither evaluating it nor remanding the case to the ALJ for consideration. *Id.* at 19. Defendant responds that the Appeals Council was not required to engage in a detailed discussion of Dr. Caivano's opinion. (Doc. 16 at 9-10). Further, Defendant maintains that, while his opinion was new and material, it did not provide a basis for the ALJ to change his opinion because, based on Dr. Caivano's treatment notes and Plaintiff's testimony that she could sit for longer than Dr. Caivano opined, it was clear that the doctor was "leaning over backwards" to support Plaintiff's disability benefits appeal. *Id.* at 10 (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)).

Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Every medical opinion is evaluated regardless of its source, but the Commissioner generally

9

gives greater weight to opinions from a treating physician. 20 C.F.R. § 404.1527(d). In fact, when "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* Nevertheless, if the evidence supports a contrary conclusion, the opinion of any physician may be rejected. *Newton*, 209 F.3d at 455. The opinion of a treating physician cannot be rejected absent good cause that is clearly articulated in the written decision. *Myers v. Apfel,* 238 F.3d 617, 621 (5th Cir. 2001).

Based on its internal procedures, the Appeals Council need not provide a detailed discussion about all new evidence submitted to it. *Higginbotham*, 405 F.3d at 335 n.1. However, where new medical opinion evidence is so inconsistent with the ALJ's findings that it undermines the ultimate disability determination, several judges have found that the case should be remanded so that the Commissioner can fully evaluate the treating source statement as required by law. *Martinez ex rel. T.P. v. Colvin*, 2013 WL 1194234, *4 (N.D. Tex. 2012) (Averitte, M.J.) (remand required where the Appeals Council's summary denial of a request for review gave no indication that the Council had evaluated the treating source statement pursuant to 20 C.F.R. § 404.1527), *adopted by* 2013 WL 1197743 (N.D. Tex. 2013); *Collins v. Astrue*, 2012 WL 2358296, *10 (N.D. Tex. 2012) (Toliver, M.J.) (same); *James v. Astrue*, 2012 WL 920014, *6 (N.D. Tex. 2012) (Kaplan, M.J.) (same); *Kelley v. Comm'r of Soc. Sec. Admin.*, 2012 WL 527866, *12-13 (N.D. Tex.) (Stickney, M.J.) (same), *adopted by* 2012 WL 527864 (N.D. Tex. 2012) (Lynn, J.); *Lee v. Astrue*, 2010 WL 3001904, *8-9 (N.D. Tex. 2010) (Ramirez, M.J.); *cf.* SSR 96-5 (providing that adjudicators must weigh medical source statements and RFC

10

assessments and "provide appropriate explanations for accepting or rejecting such opinions"). These opinions also find support in 20 C.F.R. § 404.1527(f)(3), which requires that when the Appeals Council makes a decision, it must follow the same rules for considering medical opinion evidence that ALJs follow. Finally, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

In the case at bar, Dr. Caivano's most recent opinion directly contradicts the findings of the ALJ and the Appeals Council. Dr. Caivano found that, due to her impairments, Plaintiff (1) could sit for less than three hours and stand and/or walk for less than two hours in an eight-hour workday; (2) would need to lie down for "a lot more" than an hour a day; (3) could sit for less than 15 minutes at a time; (4) was limited in her pushing and/or pulling abilities due to neck pain and "major" lower back pain; (5) could lift and carry less than 10 pounds frequently; (6) could only occasionally reach and handle; (7) could never stoop, kneel, crouch, or crawl; and (8) sustained work activity would exacerbate her condition such that she would likely miss work more than twice a month. (Tr. 700-01). On the other hand, the ALJ found, and the Appeals Council summarily affirmed, that Plaintiff could (1) sit, stand, and walk fox six hours in an eight-hour workday; (2) lift and carry 20 pounds occasionally and 10 pounds frequently; and (3) occasionally reach overhead, stoop, kneel, crouch, and crawl. (Tr. 26).

Moreover, Defendant's argument that Dr. Caivano's treatment notes are inconsistent with his most recent opinion is both conclusory and without basis. Prior to Plaintiff's neck surgery, Dr. Caivano noted that she had both neck pain due to spinal stenosis and persistent headaches. (Tr. 611). After her neck surgery, Dr. Caivano noted that various car accidents left Plaintiff with a limited range of motion and in chronic pain, for which he prescribed pain medication. (Tr.

11

606-11). Office notes also indicate that Plaintiff was depressed and had bipolar disorder, for which Dr. Caivano prescribed anti-anxiety medication. (Tr. 608-10). Dr. Caivano's treatment notes are not inconsistent with his new medical source statement; indeed, they tend to support it. Defendant does not buttress her argument to the contrary with any reference to the record. Defendant's suggestion that Dr. Caivano "leaned over backwards" in violation of *Scott* is without merit.

Plaintiff's testimony also does not contradict Dr. Caivano's limitation on her ability to sit in any significant respect. Plaintiff averred at one point that she could sit for 20 to 30 minutes, and then stated a moment later that she could not sit for any longer than 20 minutes. (Tr. 70). The undersigned does not view this as a significant variation from Dr. Caivano's 15-minute limitation. The doctor was asked to provide his "reasoned medical opinion" regarding Plaintiff's limitations, not give an exact figure. (Tr. 700).

Dr. Caivano's medical source statement also finds support in the other medical evidence of record, such as Plaintiff's CT scan, significantly decreased range of motion, treatment records with a pain specialist, and diagnosis of a mood disorder due to her chronic pain. (Tr. 427, 491, 583-88, 619). Thus, viewing the evidence as a whole, Dr. Caivano's new medical opinion is so inconsistent with the ALJ's findings that it undermines the adverse disability determination. Accordingly, this case must be remanded so that the Commissioner can fully evaluate the treating source statement as required by law. *See Martinez*, 2013 WL 1194234 at *4. If the Commissioner rejects Dr. Caivano's opinion, she must clearly articulate good cause for doing so in a written decision. *See Myers,* 238 F.3d at 621.

Because the Appeals Council erred in failing to explicitly address Dr. Caivano's opinion,

which will likely impact Plaintiff's RFC assessment on remand, the Court need not address Plaintiff's remaining claims.  However, the Court notes that the Commissioner should address more fully on reconsideration the effects of Plaintiff's PTSD and headaches on her RFC, particularly in conjunction with the opinions provided by Drs. Wood and Theesfeld.  Further consideration of these issues may also impact any hypothetical question given to a vocational expert should another administrative hearing be necessary.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's *Motion for Summary Judgment* (Doc. 15) should be **GRANTED**, Defendant's *Motion for Summary Judgment* (Doc. 16) should be **DENIED**, and the Commissioner's decision should be **REVERSED AND REMANDED** for further proceedings.

**SO RECOMMENDED** on July 23, 2013.

_____
RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE